IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


SANDRA D. RUPLE                                                        PLAINTIFF


v.                                    No. 4:06CV00818 SWW


SOCIAL SECURITY ADMINISTRATION                                         DEFENDANT


**MEMORANDUM OPINION AND ORDER**

Plaintiff has appealed the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying her claim for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI ). The parties have submitted their appeal briefs,[1] and the issues

are now joined and ready for decision.  The Court finds, for the reasons stated below, that the

decision should be affirmed.

The Court's function on review is to determine whether the Commissioner's findings are

supported by substantial evidence on the record as a whole.[2]

> Substantial evidence is less than a preponderance, but is enough that a reasonable
> mind would find it adequate to support the Commissioner's conclusion. In
> determining whether existing evidence is substantial, we consider evidence that
> detracts from the Commissioner's decision as well as evidence that supports it. As
> long as substantial evidence in the record supports the Commissioner's decision, we

---

[1]Plaintiff's brief was filed on November 3, 2006, and the Commissioner's brief was filed on December 15, 2006.

[2]Plaintiff had the burden of proving her disability by establishing a physical or mental impairment lasting at least one year that prevents her from engaging in any substantial gainful activity.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); <u>Baker v. Apfel</u>, 159 F.3d 1140, 1143 (8th Cir. 1998); <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.

Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

Plaintiff filed an application for DIB and SSI on March 4, 2002, alleging that she became disabled on September 26, 1996,[3] due to depression and back pain (Tr. 541-543, 585-586 ). Her claims were denied initially and upon reconsideration (Tr. 501-507, 510-511). Pursuant to plaintiff's request, a hearing was conducted by an Administrative Law Judge (ALJ) on May 8, 2003 (Tr. 49-94). That ALJ denied benefits in a March 13, 2004 decision (Tr. 489-497).

On April 7, 2005, the Appeals Council vacated the ALJ's decision and remanded the proceedings for additional evidence regarding an apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT) (Tr. 522-523). A second hearing was conducted by another ALJ on August 9, 2005, at which plaintiff, her sister Lisa Gentry, and a vocational expert (VE) testified (Tr. 593-638). On December 12, 2005, the ALJ issued a decision denying plaintiff's claim for benefits (Tr. 20-29). After receiving additional evidence in the form of a letter from plaintiff's counsel, the Appeals Council, on June 16, 2006, denied plaintiff's request for review, making it the final decision of the Commissioner (Tr. 8-10). It is from this decision that plaintiff seeks judicial review.

Plaintiff was 46 years old on the date of the ALJ's decision (Tr. 20). She completed the twelfth grade (Tr. 20, 596). Plaintiff has past relevant work (PRW) experience as a checker for a

---

[3]Plaintiff had previously applied for DIB and SSI benefits, alleging the same onset date, on January 29, 1998 and December 1999 which were denied (Tr. 528-533, 574-576). Her counsel amended the alleged onset date to January 1, 2001, at the May 8, 2003 hearing (Tr. 53).

grocery store, stocker, machine operator, quality control manager, assembly line worker, painter/wallpaper hanger and proof reader (Tr. 20, 123-130, 596-602).

Plaintiff testified at the hearing that an automobile accident she had in1996 caused about 75 percent of the condition she was currently experiencing (Tr. 603).  She said the pinched nerves cause tingling in her right arm and catching in her should and hip (Tr. 603).  Plaintiff stated that Dr. Baron, who told her she had the pinched nerves, gave her trigger point shots, that she received physical therapy for months onsite, and that is where she was prescribed the TENS machine (Tr. 604).  She continued that the TENS machine had helped and was the only way she could stay off prescription medications, but it had been broken for two or more years (Tr. 604).  Plaintiff testified that the pain in her right arm limits her ability to reach although she can reach overhead to get something like a pillowcase or material on a top laundry shelf, but nothing heavy (Tr. 605).  Upon further inquiry by counsel, plaintiff stated that she could not lift a gallon of milk over her head, could possibly lift a five-pound bag of sugar, but would not be able to use her right arm to put a five-pound bag of sugar over her head for 20 minutes out of an hour (Tr. 606).

Plaintiff also testified that she has pain in her lower back for which she uses manual traction taught to her by the physical therapist consisting of putting pillows around certain parts of her body to get the vertebras to slide in place, which could take up to a day of two (Tr. 606-607).  She stated that she could not walk two or three blocks without stopping to rest due to her back hurting (Tr. 607).  When asked if she could stand in five or ten- minute periods  for a total of two hours in an eight-hour day, plaintiff answered in the negative (Tr. 607-608).  She testified that she lies on the couch and naps most of the time since her back hurts if she sits for more than 20 minutes (Tr. 608-609).

Plaintiff stated that she is being treated at the Interfaith Clinic in Conway because the fee is based on income, the Clinic sometimes permits her to charge the fee, and the Clinic helps her obtain free medicine from the pharmaceutical company (Tr. 609-610). She recently switched her medication from Lexapro and Cymbalta to Wellbutrin (Tr. 610-611). Plaintiff does not take any prescription pain medication and alternates over the counter medications of Aleve, Motrin and Ibuprofen (Tr. 611).

She described panic attacks during which she feels overwhelmed, she cannot think, her mind races, and she hyperventilates so she has to get out of the place (Tr. 613). Plaintiff stated that she avoids people, does not have transportation, and has two friends who do her shopping and check on plaintiff and her sister (Tr. 613). When asked why she was not getting psychological treatment, plaintiff responded that she did not have transportation as she sold her car due to panic attacks and to pay taxes and that people who promised to take her would not follow through after she had set up appointments with Conway Counseling Associates (Tr. 614).

Plaintiff testified that she experiences depression in cycles when she has a short temper and no tolerance for anything such as noise, and tells people to leave her alone. After a couple of days she will calm down (Tr. 615). She said that she could not afford the $45 monthly office visit to the doctor for the Adderall for her ADD and the free clinic could not order it (Tr. 616).

Plaintiff stated that she tried to work wiping windows at a detail shop in 1999 or 2000, but had no stamina and the repetitive motion wold hurt her back and get the pinched nerves in her upper body tight (Tr. 617-618). She added that her ankle pops in and out as a result of the wreck and she never knows when it will give away like her hip which was the reason she takes a "stick" with her since she had experienced falls often in the last couple of years (Tr. 619-620).

Plaintiff explained that she and her sister live together and detailed the source of funds for food and light bill, namely, food stamps, Conway Community Action Program, and churches (Tr. 621). She said her sister had lived with her for two years and takes care of her helping plaintiff get in and out of the tub, gives her back rubs when plaintiff has spasms, takes out the trash, feeds the dogs, mows the yard, and does the laundry and anything else that needs to be done (Tr. 622). Plaintiff watches movies and sitcoms to try to find something that makes her laugh (Tr. 622).

Upon questioning by the ALJ, plaintiff admitted that she used to use Valium, Xanax and similar drugs that were not prescribed for her when she felt particularly bad, but that was in the past (Tr. 625). She also explained that while she was charged with aggravated assault with a knife, she did not have any knife and the charges were reduced to terroristic threats (Tr. 626). Then the ALJ and plaintiff engaged in a series of exchanges concerning her work and earnings after 1996 (Tr. 627-630).

Gentry testified that plaintiff is in constant pain as shown by plaintiff not being active, having a pained look on her face, limping, and using a stick even around the house (Tr. 631-632). She continued that plaintiff had mood swings with rage and cries a lot (Tr. 632). Gentry stated that she helps plaintiff get in and out of the shower or tub, cooks and does all the housework and yard chores (Tr. 632-633).

The VE assessed plaintiff's work history as a grocery checker as being light,semiskilled; quality control tech as being light, semiskilled; manager of quality control tester, light, skilled; painter and wallpaper hanger, medium, skilled; and auto detailer, medium; unskilled (Tr. 634). The ALJ posed a hypothetical individual of 46 years of age with a high school education and the vocational background of the claimant who could lift or carry up to 10 pounds occasionally; stand

and walk for a total of two hours out of an eight-hour work period with 30 minutes without interruption; sit for a total of six hours out of an eight-hour work period with one to two hours without interruption; can never climb; occasionally balance; occasionally stoop; never crouch; occasionally kneel; never crawl; has no significant impairment in ability to reach or handle or feel; push and pull 10 pounds; no impairment in ability to see, hear or speak; cannot work at heights; good ability to follow work rules; fair ability to relate to coworkers; fair ability to deal with the public; fair ability to use judgment; fair ability to interact with supervisors; fair ability to deal with stress; good ability to function independently; fair ability to maintain attention and concentration; fair ability to understand, remember and carry out detailed but not complex job instructions; good ability to understand, remember and carry out simple job instructions; fair ability to maintain appearance; behave in an emotionally stable manner; and fair ability to relate predictably to social situations and demonstrate reliability (Tr. 634-635). Although the VE stated that such an individual would not be able to engage in PRW, he named as other jobs that she could perform in the regional or national economy as assembler which is unskilled, sedentary; surveillance system monitor which is sedentary, unskilled; check cashier which is sedentary, semiskilled (Tr. 635-636). The VE further confirmed that there was not any conflict between the occupational evidence provided to him that day and the DOT (Tr. 636).

When the ALJ changed the second hypothetical so that the individual can lift less than 10 pounds and has a sight impairment in use of the right arm such as lifting overhead, the VE responded

that there would not be any jobs where the individual could lift less than 10 pounds as that was less than sedentary work[4] (Tr. 636).

The ALJ found that although plaintiff had performed work subsequent to the alleged onset date, it was unsuccessful work attempts for purposes of whether she had engaged in substantial gainful activity (Tr. 20-21). After a review of the medical evidence, he further found that plaintiff suffered from an impairment that was "severe," but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 21). The ALJ summarized the plaintiff's hearing testimony and the medical evidence concerning any limitations to her physical condition (Tr. 21-22).

Next, the ALJ evaluated plaintiff's subjective allegations and complaints pursuant to the criteria set forth in Polaski v. Heckler, 739 F. 2d 1320 (8th Cir. 1984).[5] He found the disabling level of pain and functional limitations asserted was not consistent with the medical findings and the fact that she may have some level of discomfort was considered in reaching a finding of limitation to sedentary work (Tr. 23). The ALJ noted that there was no evidence of treatment for the back pain subsequent to February 2000 although plaintiff continued to seek mental health treatment; she was only using over-the-counter medications; both Dr. Barron and plaintiff had observed that plaintiff

---

[4]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a).

[5]These include the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) other treatments for relief of pain; and (6) functional restrictions.

was functioning well as long as she used the TENS unit, but her unit had been broken for two years; while plaintiff later indicated in her written statements that she no longer performed certain activities, she had reported that she did laundry, changed sheets, drove, read and visited; plaintiff was able to engage in work activity – albeit not substantial gainful activity – which shows that at times her daily activities have been somewhat greater than she has generally reported; she had not frequented a physician for hospitalization, physical therapy or even pain management and the symptomatology is not of a duration, frequency or intensity as to be disabling; and plaintiff drew unemployment benefits in 1999-2201 which indicates that she was holding herself out as able to perform some type of work (Tr. 23-24).

The ALJ also noted the psychological evidence regarding plaintiff and applied that to the mental criteria in finding moderate and mild restrictions and no evidence of any repeated episodes of decompensation (Tr. 24-26).  In addition, the ALJ found that the testimony of plaintiff's sister appeared to be based on an uncritical acceptance of plaintiff's complaints and a desire to see her receive benefits, but the testimony was not persuasive due to the factors previously discussed (Tr. 26).

The ALJ concluded that plaintiff retained the RFC for unskilled sedentary work (Tr. 26). The ALJ reviewed the testimony of the VE and his response to the first hypothetical that while plaintiff would be precluded from the performance of her past jobs, she could perform the jobs identified by the VE in his hearing testimony (Tr. 26-27).  Thus, he found that plaintiff was not under a disability at any time through the date of the decision (Tr. 28).

Plaintiff contends that the part of the RFC indicated in the hearing decision which was not included in the hearing exchange is a "slight impairment in reaching with the right hand" so the

hypothetical given to the VE at the hearing is clearly different from the one found to exist at the hearing decision.  She asserts that the hearing decision includes part of the second hypothetical as to slight impairment in the use of the right arm which determined that there were no transferable work skills, yet the decision includes jobs that were determined to be semi-skilled such as check cashier by the VE in consideration of transferred skills.  Plaintiff observes that the second hypothetical did include a "slight impairment in the use of the right arm, such as lifting overhead" which also included a lifting limitation not less than 10 pounds and the VE determined that the less-than-10 pounds lifting limitation would preclude sedentary and did not comment on the "slight impairment."  She argues that it is not known to what degree such an impairment would affect the number of jobs that the VE had enumerated.  Plaintiff contends that reaching impairments are significant because there is a repetitive reaching requirement in produce assembly and, if check cashier work is discarded because of the finding of no transferable skills, then the only occupation left, surveillance system monitor – does not appear to involve reaching, but the number of jobs available in the state is 300 and the record does not contain a finding whether that alone is a significant number of jobs.

Next, plaintiff complains that the hypothetical, upon which the ALJ found jobs exist, did not fully and completely set forth all of her limitations supported by the record as a whole.  She asserts that the decision does not contain an analysis as to why one examining physician's statements regarding limitations such as Dr. Blankenship was adopted and others such as Dr. Shaw-Bullock were not.  Plaintiff argues that there is a need for some discussion and rationale for the weight given to the opinions as the ALJ decided there were no limitations in reaching contrary to the prior ALJ's

decisions and in contrast to Dr. Shaw-Bullock's statement regarding the plaintiff's ability to sustain repetition in certain movements.

Similarly, plaintiff contends that the formulation of her mental RFC using moderate and mild limitations in the hypothetical was not based upon consideration of the entire record – reviewing various reports and noting the ALJ felt the need for more evidence in seeking a post-hearing exam – as there is no evidence to support those conclusions.

Plaintiff also challenges the ALJ's findings as to plaintiff's credibility.  She argues that an inquiry must be conducted into the circumstances surrounding the failure to follow a course of treatment and whether such treatment would sufficiently improve her condition or ability to work. Plaintiff states that she has not worked significantly since 1999, she described herself as not having any income, she could not afford psychological treatment and she described living in very meager circumstances.  She continues that the ability to do light housework and visit friends provides no support for the ability to perform full-time competitive work; the majority of unemployment benefits noted by the ALJ were during the period before the amended onset date of January 1, 2001; and the ALJ did not consider her work history of employment from 1990 through 1999 which does not detract from her credibility.

Plaintiff requests that she should be awarded benefits without further delay based on the extensive medical records and her testimony.  In the alternative, she requests the case be remanded for a full, fair, and proper consideration of the disability application.

Plaintiff was seen in the Baptist Memorial Hospital emergency room on June 26, 1995, complaining of low back pain, which she had experienced in the past; the diagnosis was acute left

sacroiliac strain and she was prescribed Lortab and warm moist compresses over the low back (Tr. 310-311).

She was in a motor vehicle accident on September 26, 1996, and was seen at the Baptist Memorial Hospital emergency room the next day with pain in her neck and low back (Tr. 303). After x-rays, she was prescribed Lortab and Motrin and advised to use ice for a day to be followed by heat and see her own doctor if not better in 7-10 days (Tr. 304).

Plaintiff returned to the emergency room on October 16, 1996, with a variety of complaints – back, neck and shoulder pain, cannot sleep, nauseated, and had run out her medication (Tr. 295). The diagnosis was acute anxiety, possible drug-seeking, and multiple pain; she was to see her own doctor that afternoon (Tr. 296).

In a June 25, 1997 summary, Dr. Ed Barron, who she first saw on October 16, 1996, stated that plaintiff had been assessed with a musco-ligamentous injury to the cervical spine plus an injury to the thoracic and lumbar spine with contusion to the shoulders, multiple soft tissue injuries, cephalagia secondary to the injuries sustained and acute situational reaction secondary to the injuries manifested by anxiety, depression, insomnia and moderate anorexia which had been treated successfully with Paxil (Tr. 317).  Objectively, he found that plaintiff does have some muscle tightness in the posterior cervical musculature in the areas of the splenius, capitus, and cervicus extending out into the superior trapezius and medial deltoid; there was no trigger point pain or involuntary muscle spasm but simply tightness that is still palpable in the area and tenderness to the palpation; there were remains well circumscribed; the range of motion of the cervical was very good; pressure against the chin and occipital elicit no pain in the posterior cervical compartment straight leg rasing was normal; thoracic rotation was normal; no evidence of any involuntary muscle spasm

or tightness in the thoracic or in the lumbar musculature; plaintiff was able to go from the sitting to lying, lying to sitting position without difficulty; gait  was completely normal; affect was appropriate, she seemed to be very cheerful and was going quite well; and "she does function very well as long as she does continue to use the TENS unit" (Tr. 318).  Dr. Barron's assessment:

> By enlarge resolution of injuries sustained in MVA with residual cervical left shoulder girdle injury that has as this point become chronic.  Fortunately, most of the problem with this is controlled with the TENS unit and with her stress being controlled with the Paxil.  (I think this is producing her fear of driving.)  We have made an incredibly good strides.  I feel that she can be dismissed from active medical care for injuries sustained in MVA.  I do feel that she will be having future medical expenses because of the injuries sustained and therefore should be given a 5% permanent partial disability.  On cervical spine films that were done on today's visit she does have a continued reverse of the lordotic curvature that is extremely evident on the films and is compatible with her clinical history and physical findings.

(Tr. 318).

Plaintiff was again seen at the Baptist Memorial Medical Center emergency room on November 26, 1997, with back pain; she was prescribed Pyridium and Lortab and was to rest and avoid activities that increase pain (Tr. 284).

On February 15, 2000, plaintiff was treated at the Conway Regional emergency room for lumbar muscle strain and received as medicine oxycodone with acetaminophen and carisoprodolaspirin compound (Tr 389).

Plaintiff visited Counseling Associates for an intake screening on February 10, 1998, upon referral through the Department of Human Services with the diagnostic impression: Axis I major depression, recurrent; Axis II deferred; Axis III pain and partial disability; Axis IV unemployed, financial stress, lack of support system; Axis V 45; and statement of prognosis was fair (Tr. 365). She was later seen that same date on an emergency basis by the staff psychiatrist  with depressive and anxiety symptoms since she had run out of money for Paxil on January 10th (Tr. 362).  The

diagnostic impression was major depressive disorder and benzodiazepine abuse, versus dependence; she was to discontinue Prozac and initiate Serzone (Tr. 362).

Plaintiff saw Dr. Norman Pledger at the Protho Family Medical Center on March 23, 1998; her exam was negative and it was thought she probably had some anxiety and depression (Tr. 370). He increased her Serzone, but she left in a rage after discussion revealed she was also taking Valium from another relative and that she should follow through at Professional Counseling Associates (Tr. 370).

On March 1, 1999, plaintiff saw Dr. Diane Franco complaining of depression since she had been a teenager, heartburn, and spastic colon (Tr. 385). She told the doctor that while she was not satisfied with Paxil and Serzone, she felt like she enjoyed life when she was on Prozac, had no absences from work, and was no longer binging on food (Tr. 385). Plaintiff was assessed with depression, probable GERD, and a likely spastic colon and constipation (Tr. 385).

Through Dr. Ronald Fewell at the Jacksonville Medical Clinic, plaintiff received Prozac in September and November of 1999 for anxiety and, on April 3, 2000, received Prozac, but was denied further indigent samples as the program was for temporary use (Tr. 396-397).

Plaintiff was seen by Dr. J. Shaw on July 25, 2000, when she was diagnosed as manic depressive, given a refill for Prozac and had a negative pregnancy test (Tr. 400-401). The February 28, 2001 follow up visit notes "improved," and she was diagnosed with anxiety/depression and prescribed Prozac, Visteril, and Valium (Tr. 399).

A general consultative examination on plaintiff's complaint of depression, scoliosis, and back/neck pain was conducted on June 20, 2002, by Dr. Rose Shaw-Bullock (Tr. 403-410). A review of the spine revealed normal range of motion except 10% less for flexion-extension of the

lumbar spine and pain was noted on forward flexion, flexion and rotation of the cervical spine and at L4/L5 of the right side of the lumbar spine on flexion-extension; there was no muscle spasm (Tr. 406).  Range of motion was normal for shoulders, elbows, wrist, hands, hips without lower back pain with rotating and flexion of hips, knees and ankles (left ankle tenderness medially) with very mild spinal asymmetry; there was no muscle weakness or atrophy (Tr. 406-407).  Gait was normal, Romberg was negative, heel to shin was normal ability, ability to walk on heel-toes was normal without lower back pain with heel walk; and squatting for half the potential with stiffness (Tr. 408). Dr. Shaw-Bullock's diagnosis was arthritis in multiple areas with neck and lumbar pain, hips and left knee; depression; and anxiety (Tr. 409).  She stated that plaintiff could sit, stand, walk, carry and handle objects, but would have worsening of pain in her neck, lower back, and hips with repetitive activities or performing activities over an extended period of time (Tr. 410).

Dr. Mark Clark performed a mental status and evaluation of adaptive functioning for DDS on June 21, 2002 (Tr. 411-420).  His diagnosis was major depressive disorder, recurrent, moderate severity and personality disorder NOS with borderline, histrionic, and antisocial features (Tr. 417). He stated that plaintiff reported a long history of aggressive behavior with employers and co-workers and that there was no evidence of malingering although there may have been some exaggeration (Tr. 418-419).

On December 2, 2002, plaintiff was seen by Dr. Charles Himmler complaining of attention deficit/HD, body dimorphic disease, anxiousness, pinched nerves, lumbar problems (MVA), and scoliosis; she was given Prozac, Visteril, and Adderall (Tr. 475-478).  Subsequent notes reflect that plaintiff failed to appear on January 17, 2003, and returned for free samples on January 27, 2003;

although she was given free samples on February 3, 2003, the notes continue that since she had been non-compliant about returning to the clinic there would be no more assistance (Tr. 477).

A forensic evaluation was made on February 7, 2003, by Dr. Ed Stafford in connection with charges filed against her by the Faulkner County Prosecuting Attorney (Tr. 471). His opinion was alcohol abuse, rule out anxiety disorder not otherwise specified, and personality disorder, not otherwise specified with antisocial features (Tr. 473). He further opined that plaintiff could work with her attorney to resolve the charges, can be adjudicated to stand trial and had the capacity to have the culpable mental state required to establish an element of the offense charged (Tr. 474).

Plaintiff was examined by Dr. William Blankenship of OrthoArkansas on September 1, 2005, regarding her complaints of thoracic and lumbar spine (Tr. 568). His examination showed that she could actively extend her right knee with flexion at the hip with no apparent difficulty; no list, scoliosis or paraspinal muscle spasm was noted either in the cervical or lumbar area; biceps, triceps, brachial radialis and knee and ankle jerks area all normal, active and equal; no intrinsic weakness or atrophy of either upper extremity; no weakness in the anterior tibialis, extensor hallucis longus, short toe flexors or peroneals on either side; x-rays revealing narrowing of the lateral intervertebral joints bilaterally at C3-C4 and C4-C5, slight straightening of the cervical lordosis, narrowing of C2-C3- and C4-C5 levels, normal alignment of thoracic spine with some osteophyte formation at almost every level, normal alignment of lumbar spine with SI joints appearing open, Grade II spondylolisthesis of L5 on S1 with a Knutson's phenomenon, osteophyte formation off the anterior superior margin of the body of S1, integrity of the intervertebral disc spaces well maintained at all other levels, and a pars defect seen (Tr. 569). Dr. Blankenship's impression was degenerative arthritis in the cervical, thoracic and lumbar spine and Grade II spondylolisthesis, L5 on S1; he noted

that her walk was very slow and measured and while she requested that she be escorted by a wheelchair or other means to return to her car, she had walked in by herself (Tr. 570).

His medical assessment of plaintiff's ability to perform work-related activities was that she could lift and/or carry up to 10 pounds and 11-20 pounds frequently, 20 to 50 pounds occasionally, and never lift over 50 pounds; sit 8 hours in an 8-hour workday; stand and/or walk 8 hours in an 8-hour workday; frequently simple grasp, fine manipulations, handle objects, feel objects, push/pull/operate hands with hands or feet, reach, climb, balance, stoop, crouch, kneel, and crawl (Tr. 572).

Dr. Sam Boyd performed a consultative psychological evaluation with mental status examination on September 15, 2005 (Tr. 557). His diagnoses were Axis I: adjustment disorder with depressed mood, Axis II: no diagnosis, Axis III: numerous physical problems by history, Axis IV: unemployment, and current GAF 55 with GAF 55 as highest the past year; prognosis was that plaintiff's condition could improve significantly during the next twelve months with appropriate outpatient psychotherapy and medication management (Tr. 561). He found her to have no impairment to understand, remember and carry out short, simple instructions; had a slight impairment to understand and remember detailed instructions, carry out detailed instructions, and to make judgments on simple work-related decisions, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond to changes in a routine work setting due to mild depression; and had a moderate impairment with her ability to interact appropriately with the public due to mild depression (Tr. 564-565).

The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of all treating physicians and others, and claimant's own descriptions of her limitations.  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).  As the Commissioner points out, the ALJ reviewed the various medical records and his assessment for sedentary work with additional restrictions is more restrictive than indicated by the examining physicians.  The Commissioner has correctly argued that while plaintiff relies on Dr. Shaw-Bullock's observation that pain could worsen with repetitive or sustained activities to indicate a reaching restriction, the examination results revealed no deficits in plaintiff's extremities and Dr. Shaw-Bullock never specifically addressed reaching.  Although plaintiff argues that the ALJ did not explain why he chose Dr. Blankenship's limitations over other doctors such as Dr. Shaw-Bullock, the Court agrees with the Commissioner that the results are not inconsistent and the Court also notes Dr. Blankenship's speciality.

The Court again agrees with the Commissioner that the ALJ's mental RFC findings were more restrictive than those assessed by Dr. Boyd as he found only slight restrictions except for a moderate restriction in her ability to interact appropriately with the public whereas the ALJ used fair as the standard in eleven different areas.  Clearly, there is sufficient evidence to support the ALJ's mental RFC findings.

Turning to plaintiff's arguments regarding the VE's testimony, the Court concurs with the Commissioner that there was really no inconsistency in the ALJ's hypothetical question to the VE when he stated that plaintiff had no significant impairment in the ability to reach, handle or feel when the decision refers to a slight impairment in reaching with the right hand.  Thus, plaintiff's argument – that the jobs of produce assembly and check cashier must be discarded as they involving

reaching and so the remaining occupation of surveillance system monitor totaling 330 positions in

Arkansas which is not significant number – fails.  In addition, as pointed out by the Commissioner,

the Eighth Circuit has found 220 jobs to be a significant number in Johnson v. Chater, 108 F.3d 178,

180 n.3 (8th Cir. 1997), as follows:

> Johnson relies on several district court cases to attempt to bolster her contention that
> 200 jobs in Iowa is not a significant number of jobs and that the Commissioner
> consequently failed to show that Johnson is not disabled.  See, e.g., Jimenez v.
> Shalala, 879 F.Supp. 1069, 1076 (D. Colo. 1995) (holding that "200-250 jobs spread
> across Colorado is not significant"); Waters v. Secretary, 827 F.Supp. 446, 449
> (W.D. Mich. 1992) (holding that 1000 jobs in Michigan, all of which would require
> at least 180 miles of travel to get to them, is not a significant number).  These cases
> are unpersuasive, however, particularly in light of the overall record before this
> Court.  The cases Johnson cites are all fact-intensive, and none stand for the
> proposition that 200 jobs in Iowa is not a significant number.

"A hypothetical question, however, need only include impairments that are supported by the

record and which the ALJ accepts as valid."  McKinney v. Apfel, 228 F.3d 860, 865 (8th Cir. 2000).

The hypothetical question submitted to the VE was consistent with the limitations that the ALJ had

found for plaintiff's RFC.  A properly phrased hypothetical question, as posed by the ALJ here,

constitutes substantial evidence.  Warburton v. Apfel, 188 F. 3d 1047, 1050 (8th Cir. 1999).

The Court finds the ALJ made a proper credibility analysis in addressing the Polaski factors.

See, Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).  An ALJ may discredit subjective

complaints of pain if they are inconsistent with the record as a whole.  Barry v. Shalala, 885 F.Supp.

1224, 1225 (N.D. Iowa 1995).  He noted her lack of treatment for her back pain since 2000, her use

of over-the-counter pain medication, the success she had with the TENS unit, and her daily activities

as she reported at one point.  The Court finds that the ALJ explained why, using the Polaski

framework, he found plaintiff's subjective allegations of pain to not be fully credible.  "It is for the

ALJ as trier of fact to give the testimony of family members and friends such credence as he deems warranted." <u>Kisling v. Chater</u>, 105 F.3d 1255, 1258 (8th Cir. 1991).


        In sum, the Court finds that there is substantial evidence to support the Commissioner's decision that plaintiff was not disabled.  Accordingly, the Commissioner's administrative decision is hereby affirmed.


        IT IS SO ORDERED this 13th day of September, 2007.

                                            <u>/s/Susan Webber Wright</u>

                                            UNITED STATES DISTRICT JUDGE